UNITED STATES DISTRICT COURT  ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---

LAURIE MAINELLA,

                             Plaintiff,

      - versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                             Defendant.

MEMORANDUM
AND ORDER
13-CV-2453

A P P E A R A N C E S:

    CHRISTOPHER J. BOWES
        54 Cobblestone Drive
        Shoreham, NY 11786
        *Attorney for Plaintiff*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
    By:    Arthur Swerdloff, Assistant U.S. Attorney
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Laurie Mainella seeks review of the Social Security Administration's decision denying her disability benefits. Mainella contends that she is fully disabled due to various psychiatric conditions, but the Social Security administrative law judge ("ALJ"), and ultimately the Acting Commissioner of Social Security, determined that Mainella would be able to do some work. In this action, Mainella argues primarily that the ALJ failed to identify an opinion as that of her treating psychiatrist and therefore failed to give that opinion the proper weight under law. She also argues that the agency improperly relied on GAF scores, a recently deprecated

psychological metric. For the reasons given below, the Commissioner's motion for judgment on the pleadings is granted, and Mainella's is denied.

BACKGROUND

Mainella seeks Social Security disability benefits beginning on January 19, 2012, the date she most recently sought treatment for bipolar disorder.

At the time of her hearing before the ALJ, Mainella was 38 years old and lived with her teenaged daughter. R. 35-36. She completed tenth grade and did not have a GED. She was last employed in January of 2012, when she quit a part-time job at a bagel shop. R. 36. Before that, she had worked as a waitress and as a cashier at a pharmacy; she was fired from both jobs. R. 37. Mainella does not drive; she uses public transportation. Mainella cooks and cleans for herself and her daughter. R. 42-43. She shops for groceries about twice a month. She has had an on-and-off relationship with her boyfriend for about ten years. R. 44.

Mainella has received mental health treatment since childhood. In 1997, she was in an abusive relationship and saw a therapist for a few weeks. She saw a therapist again in 2003. Mainella was evaluated by Arbor WeCare in 2006 in connection with receipt of public benefits, and she reported assorted symptoms, including difficulty concentrating and remembering, depression, lack of interest in leaving her house or seeing other people. Mainella has a history of substance abuse problems, for which she has sought inpatient treatment. R. 40. However, because she seeks benefits only from January of 2012, her symptoms from that time are most relevant here.

Since January of 2012, when she applied for the disability insurance at issue in this case, Mainella has had a series of treatments and diagnoses from mental health professionals. In February of 2012, Mainella received an initial psychiatric evaluation from a nurse practitioner,

Nancy Carr, at Staten Island University Hospital. R. 453-57. Though she was then on medication, Mainella reported that she was easily depressed and had trouble concentrating; she also reported mood swings, irritability, and sleep problems. Mainella continued seeing Carr through at least December 2012; Carr periodically adjusted Mainella's medication regimen.

On March 2, 2012, Mainella was evaluated by a doctor, Hun Han. R. 357-79. On March 5, another doctor, Robert London, also evaluated Mainella. Han and London agreed that Mainella's mental condition would prevent her from working for at least twelve months.

In late April 2012, a Disability Determination Services psychologist, Richard Altmansberger, evaluated the paper record produced by Drs. Han and London. R. 58-62. Almansberger diagnosed polysubstance abuse, anxiety disorder, bipolar disorder, and personality disorder; he believed Mainella retained sufficient residual functional capacity to work.

After her application for benefits was initially denied at the administrative level, Mainella requested a hearing and appeared before ALJ Patrick Kilgannon on December 5, 2012. ALJ Kilgannon issued his decision denying benefits on December 28, 2012. The Appeals Council denied review on March 12, 2013, and Mainella brought this action.

## DISCUSSION

A.   *The Legal Standards*

A claimant seeking disability insurance benefits must establish that, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 1382c(a)(3)(B).

The Social Security regulations direct a five-step analysis for the Commissioner to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last (but only to show that jobs exist in the national or local economies that the claimant can perform given her RFC and vocational factors). *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003).

The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1). Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the record contains evidence which "a reasonable mind might accept as adequate to support [the

Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the [Commissioner] even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

B.        *Application*

           1.   *Five-Step Analysis and Standard of Review*

The parties agree that Mainella satisfied the first several steps for being adjudicated disabled. First, at the time she applied for benefits, she was employed only trivially, and has not worked since. Second, the ALJ agreed that Mainella's diagnosed conditions are "severe" within the meaning of the Social Security Act. *See* 20 §§ C.F.R. 404.1520(c) & 416.920(c). The key point of contention is whether Mainella's conditions leave her with enough residual functional capacity to work, either in one of her previous jobs or in a different job. The ALJ held that Mainella's conditions were not so disabling as to prevent her from performing a low-stress job without interaction with the public. R. 14-15. Specifically, the ALJ found that Mainella should be able to perform work as a document preparer (a position she previously held), or other jobs such as a kitchen helper or mail clerk. R. 19-20. In reaching this conclusion, the ALJ essentially rejected the conclusions reached in the medical report ("Medical Source Statement") prepared at SIUH.

Mainella's primary argument before me is that the ALJ improperly discounted the opinions set forth in the Medical Source Statement. Mainella alleges that report was prepared in part by Mainella's treating physician, Dr. Swarnamba Mani. Mainella argues that because the ALJ did not notice Dr. Mani's signature on the report, the ALJ did not realize that the report was prepared by her treating physician. Therefore, Mainella argues, the ALJ did not accord the Medical Source Statement the weight it is due under the treating physician rule.

5

Under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the opinion of a treating physician is entitled to "controlling" weight unless it conflicts with other substantial evidence in the record.  *E.g. Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. § 404.1527(c)(2).

It is true that the ALJ did not specifically mention Dr. Mani or otherwise engage with the question of whether the report was prepared by Mainella's treating physician.  However, the record leaves a number of questions about Dr. Mani and the Medical Source Statement.

First, the relevant page of the administrative record does show a signature that could be Dr. Mani's, but it is difficult to read, and no printed name appears next to the signature (as is the case for the other two signatories).  *See* R. 425.  Thus, it is not totally clear that Dr. Mani signed the report Mainella cites.

Second, even assuming that Dr. Mani signed the report, the record does not show what role Dr. Mani played in Mainella's care or evaluation.  Dr. Mani's name does appear at other places in the record – for example, in the header of pages R. 439-64 – but there, too, the documents submitted offer no explanation of the role that Dr. Mani played in Mainella's care.  Without any indication that Dr. Mani actually supervised Mainella's care, the Medical Source Statement represents the opinion of a nurse practitioner, not a doctor.[1]  In analogous circumstances, courts have given weight to statements of non-physicians in accordance with how closely the evaluator worked under the supervision of a physician.  *See, e.g., Godin v. Astrue*,

---

[1] The reason for deference to the treating physician is a combination of the physician's expertise and presumptive familiarity with the applicant's case.  *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").

6

3:11-CV-881 SRU, 2013 WL 1246791, at *3 n.2 (D. Conn. Mar. 27, 2013) (holding that "despite undisputed evidence" that a nurse practitioner had treated the plaintiff "regularly over a period of several years," the ALJ "correctly determined that, because there was no evidence to suggest that [the nurse practitioner] worked under the supervision of and in close consultation with [the treating physician], [the nurse practitioner's] opinions, standing on their own, could not be considered those of a treating physician," and citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)).

But even if it were clear that the opinions in the Medical Source Statement were in fact Dr. Mani's, and thus that the treating physician rule applied to the Medical Source Statement, remand would still be unwarranted. That is because the ALJ rejected the report not because it came from a non-physician source, but because the ALJ found it inconsistent with other record evidence. Thus, the ALJ's reasoning applies equally well to reject the Medical Source Statement even if it represents the opinion of a treating physician. *See Veino*, 312 F.3d at 588 (treating physician's opinion not controlling when contradicted "by other substantial evidence in the record").

Specifically, the ALJ gave "little to no weight" to the Medical Source Statement for three reasons. First, he found the Medical Source Statement internally inconsistent, since it stated that Mainella had marked limitations in her abilities to understand and remember short simple instructions, carry out short simple instructions, and carry out detailed instructions, but also that she would have only moderate restrictions in her ability to understand and remember detailed instructions. R. 18. Second, the ALJ found that the Statement's conclusion that Mainella could not at all function independently outside the home was contradicted by the fact that Mainella used public transportation to reach her appointments. R. 18. Third, the ALJ found

7

the Statement's conclusions of incapacitation inconsistent with Mainella's daily activities, "which include taking care of her daughter, attending to her personal care needs, performing household chores such as cooking and cleaning, walking, going shopping, managing her own finances, and going outside alone." R. 18.

Without the benefit of live testimony, I am not well situated to reevaluate such factors as witness credibility and demeanor. That is part of why my review is only for substantial evidence. Especially with that limitation, I cannot say that the ALJ's reasons for discounting the Medical Source Statement were unsupported. For example, the internal inconsistency in the report constitutes a reasonable basis to believe that it was not prepared with the type of attention to detail indicating reliability. *See, e.g., Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (noting that consistency "is a factor in deciding the weight accorded to any medical opinion" under 20 C.F.R. § 404.1527(d)(4)). And the record as a whole does not compel a view of the facts contrary to the agency's.

2. *GAF Scores*

Mainella also argues that the case should be remanded because of the use of GAF scores in the evaluation. The GAF score, for "global assessment of functioning," is a numeric scale ranging from 0 (lowest functioning) through 100 (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue,* 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* at 32 (4th ed. 2000)). However, the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders*, the professional standard handbook for mental health diagnosis, has dropped the use of the scale. The Social Security Administration

issued a bulletin dated July 31, 2013, limiting use of GAF scores. At a basic level, the Administration noted that "[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation." *See* Pet.'s Mem, Ex. B, at 2. There are other problems: the GAF score is not designed to predict outcomes, and the scores are so general that they are not useful without additional supporting description and detail. *Id*. at 2-3. The new guidance offers a number of suggestions for using GAF evidence. Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used. *Id*. at 3-4.

Here, the agency did not give the GAF scores undue or mechanical weight, even in light of the new guidance. Rather, they were treated as opinion evidence. For example, the ALJ noted that the GAF scores of 65-70 were consistent with both medical opinion and Mainella's self-reported activities, such as the ability to care for herself, go shopping, and use public transportation. R. 17. The ALJ did not simply accord the numbers weight; he looked to the underlying bases for those numbers and analyzed them in the context of the evidence as a whole.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted, and Rodriguez's cross-motion is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 14, 2014
      Brooklyn, New York